ATTORNEY FOR THE RESPONDENT
Ralph L. Tambasco
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
Laura Iouse, Staff Attorney
John P. Higgins, Staff Attorney
Indianapolis, Indiana

# In the
# Indiana Supreme Court



No. 49S00-1106-DI-318

IN THE MATTER OF:

STEVEN B. GELLER,

*Respondent.*

Attorney Discipline Action
Hearing Officer Thomas G. Burroughs

**May 16, 2014**

**Per Curiam.**

We find that Respondent, Steven B. Geller, engaged in multiple acts of attorney misconduct, including dishonesty to a court and to the Commission, improper communications with a judge and with a represented party, neglect of vulnerable clients, disorderly conduct in a judicial facility, and conduct prejudicial to the administration of justice. For this misconduct, we conclude that Respondent should be disbarred.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. Respondent's

1989 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

## **Background**

On June 1, 2011, the Commission filed a two-count "Verified Complaint for Disciplinary Action" against Respondent, which was amended on March 19, 2012, to add two additional counts. The Commission alleged violation of fourteen provisions of the Indiana Rules of Professional Conduct. The hearing officer filed his 105-page report on October 29, 2013, making proposed findings of fact and concluding that the Commission had met its burden of proving by clear and convincing evidence that Respondent violated twelve rule provisions, as described below.

The Hearing Officer's report

Count 1 - Juvenile court incidents. The Honorable Marilyn Moores is the chair of the Marion Superior Court's Juvenile Division ("Juvenile Court"). In July or August 2007, Respondent arrived over an hour late for a hearing at the Juvenile Court. Respondent spoke with Judge Moores, who instructed him to call the court if he experienced unavoidable delays when scheduled to appear in the Juvenile Court.

Thereafter, Respondent represented parties in two cases that were both scheduled for hearing or conference in the Juvenile Court on September 11, 2007, at 10:00 a.m. Although Respondent also had a heavy calendar of hearings scheduled at the City-County Building at that same time, he took no action to eliminate the conflicts. On September 11, 2007, Respondent was running late but did not call the Juvenile Court to inform them of his delay. The cases were called before Respondent arrived.

When Respondent arrived at the Juvenile Court, Respondent saw R.D., a former client who believed that Respondent owed him money. Respondent walked past R.D., but he then heard his name called, turned, and bumped into R.D. Respondent pushed R.D. to the side and an altercation ensued. The assistant chief bailiff restrained Respondent. Two other bailiffs stepped

between Respondent and R.D. Respondent leaned toward R.D., pointed his finger and said, "I'll f***ing kill you!" Over Respondent's resistance, the bailiffs moved Respondent to a different area. One bailiff then walked Respondent to his car. On the way, Respondent turned to a woman and said something to the effect of, "Did you see how I handled that a**hole?" When the woman responded, Respondent replied, "Shut up, bitch."

Respondent testified he was ashamed of his behavior and wrote Judge Moores a letter because he was sorry for his actions. The hearing officer found Respondent's apology was driven more by his desire to preserve his ability to practice law than by genuine remorse, noting that the letter was not written until December 20, 2007, the same date he responded to the grievance against him. The hearing officer also found that Respondent's testimony was conflicting and lacked credibility.

The hearing officer concluded that the Commission had *not* proven that Respondent violated Rule 3.2 or Rule 8.4(d) by a single incident of causing a delay in the two cases set for hearing or conference. The hearing officer also concluded that the Commission had not proven that he violated Rule 3.4(c) by failing to contact the Juvenile Court if he was going to be late, finding Judge Moores' instruction to do so was more in the nature of a suggestion than a directive.

The hearing officer concluded that the Commission had proven Respondent violated Rule 8.4(b) by committing the criminal act of disorderly conduct. The hearing officer also concluded that by engaging in an altercation at the Juvenile Court that required court personnel to intercede, preventing them from performing their court duties, Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

Count 2 - Actions in a divorce proceeding. "Husband" was represented in a divorce by attorney Gayle Mack. In December 2009, "Wife" retained Respondent. By that time, the court had issued a preliminary order granting joint legal custody of the couple's children to Husband and Wife. Under the parenting time guidelines, the allocation of major holidays between the

3

parents is affected by who is designated the primary custodial parent. The preliminary order in this case, however, did not designate either parent as primary custodian.

Husband was scheduled to have the children for Easter. In the weeks before Easter, Wife left messages for Respondent several times seeking assistance in getting the children for Easter. A few days before Easter, Wife finally spoke with Respondent, who said he would try to contact the judge for a determination.

On April 1, 2010, the Thursday before Easter, Wife called Respondent again about the matter. The court was to be closed on Good Friday, April 2, 2010. On Thursday at 2:46 p.m., Respondent called Attorney Mack about the Easter custody issue for the first time. Attorney Mack planned to leave by 3:30 p.m. to go out of town. Attorney Mack told Respondent that the best she could do on such short notice would be to try to call her client about it. Attorney Mack left Husband a message on his voice mail. Respondent called Attorney Mack a few more times that afternoon, finally "announcing" he was going to call the court to talk to the judge. Believing that no judge would talk to Respondent under these circumstances, Attorney Mack responded sarcastically, "Well, good luck with that!"

At approximately 3:48 p.m., Respondent called Magistrate Victoria Ransberger's office. On his representation that he had Attorney Mack's permission to make the call without her, Magistrate Ransberger agreed to take the call. Respondent told her the court needed to identify the primary custodial parent for the purpose of controlled expenses. Magistrate Ransberger recognized this could make a difference in dividing custody for holidays and that this was why Respondent was calling. After looking at the file, Magistrate Ransberger decided Wife should be the primary custodial parent and consequently would have custody of the children for Easter. Magistrate Ransberger then made a jacket entry in the file stating:  "Attorneys telephone for further court direction. The court having reviewed the prel. order, the CS wksheet and taking judicial notice of the file now finds that for the limited purpose of controlled expenses and for PT Guidelines, wife is designated the custodial parent." She wrote "attorneys" because Respondent represented Attorney Mack had given her permission for him to call. Respondent told Magistrate

4

Ransberger he would relay this decision to Attorney Mack, but he did not reach her because she had left for the weekend.

The next day, when Husband arrived at his house at about 6:30 p.m., he found Wife and Respondent parked in his driveway. Respondent told Husband the judge had decided Wife was the primary custodial parent and that Husband should let the children go with Wife for the Easter weekend. Husband told Respondent that if anything had been determined by the judge, he would hear about it from his own attorney. Respondent tried to call Attorney Mack without success. The children remained with Husband for the weekend. Husband delivered a grievance against Respondent to the Commission the next business day, Monday, April 5, 2010.

On April 6, 2010, Respondent filed a motion for rule to show cause. In describing the events of April 1 and 2, 2010, he described Husband as "an emotionally deranged individual" who had threatened him when he came to Husband's home—allegations the hearing officer found to be unsupported. He further demanded that Attorney Mack be admonished for her "unprofessional behavior." On April 15, 2010, Respondent filed a grievance against Attorney Mack, which the Commission dismissed.

On April 29, 2010, Attorney Mack filed a verified petition for contempt citation, based in part on Respondent and Wife visiting Husband's home on April 2, 2010. The court scheduled an attorneys-only conference for June 4, 2010, at which Respondent failed to appear.

On February 4, 2011, the court held an attorneys-only conference at which the topic of the grievance against Respondent was raised. Magistrate Ransberger recalls Respondent saying something to the effect that there was a "misunderstanding", and asking "Can we forget about this whole disciplinary thing?" Attorney Mack responded that she could not advise her client regarding the disciplinary grievance.

At one point, Respondent approached Magistrate Ransberger in the Indianapolis City Market and tried to discuss the divorce case and disciplinary matters. She told him she could not talk to him about these issues. She then recused herself from the divorce case.

5

As to Respondent's contact with Husband in his driveway on April 2, 2010, Respondent asserted that he communicated merely as an "officer of the court" or a "messenger boy." The hearing officer rejected this explanation as inherently incredible, finding Respondent knew his conduct was improper, and that he proceeded out of a desire to remedy his prior failure to obtain a ruling from the court. The hearing officer also found Respondent's claim that Attorney Mack gave him permission to call Magistrate Ransberger without Attorney Mack's participation and his overall testimony regarding the events at issue to be unbelievable and inconsistent.

The hearing officer concluded that Respondent violated all rules charged in Count 2: Rule 3.5(b) by an improper ex parte communication with a judge; Rule 3.3(a)(1) by falsely telling Magistrate Ransberger that Attorney Mack had given him permission to call the court ex parte; and Rule 4.2 by discussing the custody issue with Husband without his counsel's presence or consent.

Count 3 – The S.M. representation. In 1993, S.M. was sentenced to 15 years on a felony rape conviction. On January 5, 2004, he filed a pro se petition for post-conviction relief ("PCR"). In September 2005, S.M. was released on parole. In March 2006, he met with Respondent, who told S.M. that representation in the PCR case would cost $3,000, which S.M. could pay in $50 weekly installments. S.M. paid Respondent a $600 deposit and paid weekly installments until June or July 2006.

Around May 2006, S.M. gave Respondent his deceased father's life insurance policy and a shareholder policy, believing he might be entitled to some recovery. After some research, Respondent learned the worth of the stock shares and that no one had collected the death benefit on the insurance policy. Respondent told S.M. he would not charge him for his work involved in liquidating these assets.

In late June or early July 2006, S.M. informed Respondent he had failed to appear for polygraph testing required by his parole agreement. According to S.M., Respondent told S.M. he would be there for S.M. Respondent never told S.M. that he intended to charge S.M. any

6

additional fee or that Respondent was deducting any money from the amount S.M. had paid. After S.M. was arrested for parole violation ("PV"), Respondent did not appear at S.M.'s initial PV hearing, did not respond to two letters from S.M. regarding the PV case, and did not appear at the final hearing on August 14, 2006. The parole board found S.M. violated his parole and sentenced him to one year.

On August 20, 2006, S.M. wrote to Respondent a third time, advising him of the results of the final PV hearing. Believing Respondent was still pursuing the PCR case for him, S.M. also directed Respondent to draw $1,000 from a debit card he sent Respondent for safekeeping as payment toward his attorney fee. Respondent did not respond to this letter. Without informing S.M., Respondent charged S.M. $500 for work he claimed to have performed trying to secure S.M.'s release in the PV case. S.M. was released on parole in March 2007. Believing Respondent was working on his PCR case, S.M. resumed making installment payments to Respondent.

On August 9, 2007, S.M. was arrested on new allegations of parole violation, including failure to register as a sex offender. Respondent did not respond to S.M.'s request to bring an administrative appeal. S.M. called Respondent twice prior to his September 12, 2007, PV hearing. Respondent told S.M. that he would appear at his hearing but he did not. The parole board sentenced S.M. to serve six months. While back in prison, S.M. twice wrote to Respondent, who did not respond.

Around March 2008, S.M. was released from prison. For several months, Respondent gave him excuses for why work was not being done. Finally, S.M. asked Respondent to return the life insurance and shareholder policies. Respondent returned the shareholder policy but could not locate the life insurance policy. With the help of a friend, S.M. contacted Indiana Unclaimed Property and obtained $900 for the shares he inherited. S.M. never recovered anything on his father's life insurance policy. S.M. continued to make payments toward Respondent's fee, believing that if he could show Respondent that he would be paid, Respondent would tend to his case.

In fall 2009, S.M. asked Respondent about representing him in a lawsuit because he felt he had been illegally incarcerated for his parole violations. After a week, Respondent told him filing such a suit would cost him more than it would be worth. At one point, S.M. asked Respondent to help get him removed from the a sex offender registry because his conviction predated the registry requirement. Respondent never pursued this. S.M. resolved the matter on his own when he went to register in 2011 and discovered he was not required to register in the first place.

On November 24, 2009, S.M. paid Respondent another $300, believing he had paid Respondent the full $3,000 fee. Respondent agrees that S.M. paid him in full but says that the fee was actually just $2,000. In any case, Respondent never deposited these fees into his trust account and has no ledger or receipts to document how much S.M. paid him. On February 11, 2010, nearly four years after he was hired, Respondent filed his appearance in the PCR case and a motion for leave to file amended PCR petition. The final work product consisted of five pages of pleadings. Respondent has taken no further action.

Respondent contended he was unable to draft and complete the PCR petition because S.M. kept "piling" on new tasks and S.M. used up the fees he had paid on these new assignments. The hearing officer found this claim untenable because Respondent never completed the new assignments and he did not inform S.M. that he was charging S.M. for work performed on the new assignments out of the funds S.M. paid Respondent. The hearing officer also noted that Respondent's testimony regarding the work he performed and the fees he charged was shifting and contradictory.

The hearing officer concluded that Respondent violated all rules charged in Count 3: Rule 1.3 by lack of diligence; Rules 1.4(a)(3), 1.4(a)(4), and 1.4(b) by failure communicate with his client; and Rule 1.5(b) by failure to communicate the scope of his representation and the basis or rate of his fee.

Count 4 – The T.S. representation. T.S. was convicted of several drug-related felonies in 2002 and released on probation in 2007. In October 2008, T.S. was arrested in Bartholomew

County for possession of methamphetamine. Based on the new arrest, a petition to revoke probation for violation of probation ("VOP") was filed the following month in Jennings County.

T.S. told Respondent in December 2008 that he wanted the original conviction overturned. T.S. paid Respondent $250 to review the transcripts of his trial. Respondent later told T.S. he had grounds for a PCR petition, and T.S. paid him an additional $400 to pursue it. They did not discuss Respondent representing T.S. on the VOP case.

In January 2009, T.S. was arrested again in Bartholomew County on drug charges and fled to Oklahoma. In February 2009, Respondent filed an appearance for T.S. in the VOP case in Jennings County. On the date set for hearing, January 20, 2010, Respondent called the court and stated his intention to withdraw, but he did not file a withdrawal motion. Neither Respondent nor T.S. appeared for the VOP hearing, and the court issued a warrant for T.S.'s arrest.

T.S. was arrested in Oklahoma. During his detention there, T.S. wrote two letters to Respondent stating he wanted Respondent to pursue overturning his original conviction. Respondent did not respond. T.S. then asked his family to contact Respondent. At Respondent's request, T.S.'s father paid Respondent an additional $500 to work on the PCR petition.

In July 2010, T.S. was extradited to Indiana and detained in the Bartholomew County jail. Despite repeated requests by T.S. through his sister, Respondent performed no work on the PCR or VOP matters. T.S. decided he should retrieve his paperwork from Respondent and find another attorney. After a number of attempts, family members arranged to retrieve the file from Respondent's office, but the file could not be located.

Represented by another attorney, T.S. pled guilty to drug charges in Bartholomew County. T.S. was then detained at the Jennings County jail for the VOP. T.S. informed the VOP court that Respondent no longer represented him, and the court appointed a public defender. By this time, T.S. had given up on Respondent representing him and decided to proceed with the PCR petition pro se, but he was handicapped by the fact that Respondent had his file.

9

With the help of a friend, M.M., T.S. filed a grievance against Respondent in March 2011. After two Commission demands, Respondent responded that he had never been hired to represent T.S. for a PCR petition, asserted he had talked to T.S. several times when he was jailed in Oklahoma, and stated T.S. asked him to represent him with the VOP case.

On June 11, 2011, Respondent sent a letter mistakenly addressed to T.S. at the *Jackson* County jail, which eventually reached him around a month later. The letter, which was Respondent's first attempt to contact T.S. since December 2008, said that he would be visiting T.S. soon to go over his case and closed with: "By the way, who is [M.M.]? She is trying to cause trouble." In late July 2011, Respondent showed up to see T.S. at the Jennings County jail. Respondent returned T.S.'s file to him, but T.S. had already purchased the same documents from other sources.

Respondent's file for T.S. contained only eight pages that were generated by Respondent. The remaining pages were provided by the client or were court notices. The file given to the Commission contained an exact copy of the June 11, 2011, letter described above except it was addressed to T.S. at the *Jennings* County Jail, not the *Jackson* County Jail. The hearing officer concluded that the letter in the file produced to the Commission had been altered.

Respondent asserted that he was not hired to pursue a PCR petition. Rather, he says he was hired, for $750, to review T.S.'s case to see if there was any basis for a PCR petition, which he then recommended against. He asserted T.S.'s father hired him for representation in the VOP case for an additional $500. The hearing officer found Respondent's testimony to be inconsistent and not believable, and that T.S. received nothing of value for the payments Respondent received.

The hearing officer concluded that Respondent violated all rules charged in Count 4: Rule 1.3 by lack of diligence; Rules 1.4(a)(3), 1.4(a)(4), and 1.4(b) by failure communicate with his client; Rule 1.16(d) by failing to fulfill his duties to a client after the representation ended; and Rule 8.1(a) by submitting the altered letter to the Commission.

Aggravating and mitigating facts. The hearing officer found the following facts in aggravation: (1) Respondent has a history of prior discipline (discussed in more detail below); (2) despite therapy leading to his reinstatement to practice, he has been unable to deal with his emotions and law office management problems; (3) Respondent reacted explosively to Attorney Mack and to a Commission staff attorney regarding the grievance in Count 2; (4) Respondent's misconduct was due to selfish motives; (5) Respondent engaged in a pattern of misconduct and multiple offenses; (6) Respondent has engaged in a pattern of dishonesty; (7) Respondent has demonstrated a gross disregard for the authority of the Commission; (8) Respondent has refused to acknowledge the wrongful nature of his conduct; (9) S.M. and T.S. were unsophisticated and vulnerable clients; (10) Respondent has substantial experience in the practice of law; (11) Respondent has demonstrated more than a simple indifference to making restitution, still maintaining that he earned the fees he received; and (12) Respondent is not remorseful.

Respondent's Disciplinary History

The Commission filed a verified complaint against Respondent on August 2, 2000. In that case, the Court found Respondent committed the following counts of misconduct:

(1) In retaliation for a client's threat to file a disciplinary grievance, Respondent threatened to reveal the former client's conviction for child molesting to the client's fellow inmates in prison.

(2) Respondent charged a fee in a worker's compensation case in excess of that allowed by statute, attempted to release himself from liability for malpractice in a disbursement statement, commingled client and third party funds with his own, converted client and third party funds, delayed in paying a client's health care provider, and made misrepresentations to a client regarding payment to the health care provider.

(3) Respondent failed for one year to pay an insurer's subrogation claim out of proceeds recovered from a tortfeasor.

(4) Respondent sought to limit his professional liability, failed to maintain sufficient funds in his trust account to pay an insurer's subrogation lien, and delayed paying the lien for several years.

For this misconduct, the Court imposed a 12-month suspension without automatic reinstatement, effective January 10, 2003. *See* Matter of Geller, 777 N.E.2d 1099 (Ind. 2002).

On January 12, 2004, Respondent filed a petition for reinstatement. At the reinstatement hearing, evidence of Respondent's angry and threatening conduct was introduced. Two days into the reinstatement hearing, Respondent's attorney requested a 90-day recess to allow Respondent to obtain therapy. The hearing officer granted the request. When the hearing resumed, Respondent stated that the therapy was "life changing." In recommending reinstatement, the hearing officer found that Respondent was a different person from when he engaged in the misconduct that led to his suspension, and he was even different from when he began the reinstatement process. On June 16, 2005, Respondent was granted conditional reinstatement subject to a two-year probationary period, during which he was required to employ a Certified Public Accountant to review his trust account and submit reports to the Commission. 828 N.E.2d 1288 (Ind. 2005).

Respondent's Petition for Review

Respondent filed a petition for review, by counsel, in which he admits to one act of misconduct charged in Count 1, conceding that he "lost it" in responding to the aggressive behavior of his former client. He challenges the hearing officer's conclusion that he took the bailiffs away from their duties, arguing that their duties include breaking up altercations (an argument we reject – bailiffs should not have to break up fights initiated or escalated by officers of the court). Otherwise, for the most part, Respondent asks the Court to reject the hearing officer's proposed findings of fact in favor of his alternative view of the evidence.

In an unusual move, the petition for review, signed by counsel, is accompanied by an exhibit entitled "Respondent's Personal Reply to Hearing Officer's Report," which purports to offer Respondent's first-person (unsworn) observations about the events at issue. The reply is highly critical of the Commission, its staff, the witnesses against him, and the hearing officer. In his personal reply, Respondent offers the following explanation of the altered letter he provided to the Commission in Count 4. His file did not contain the original letter he mistakenly sent to the *Jackson* County jail. When he discovered his error, he opened the document on his computer, changed the address to the *Jennings* County jail, and then saved the document. Respondent, however, does not assert that he sent a copy of the amended letter to his client at the Jennings

12

County jail, and the only letter the client received was the one addressed to the Jackson County jail.

## Discussion

After carefully reviewing the hearing officer's thorough report and the parties' submissions, the Court concludes that the hearing officer's assessment of the evidence, findings of fact, and conclusions of law are well supported. We conclude that Respondent's alternate explanations of the events at issue are contradictory and not credible. The Court accepts the hearing officer's findings of fact and concludes that Respondent violated these Indiana Rules of Professional Conduct prohibiting the following misconduct:

1.3: Failure to act with reasonable diligence and promptness. (Counts 3 and 4)

1.4(a)(3): Failure to keep a client reasonably informed about the status of a matter. (Count 4)

1.4(a)(4): Failure to comply promptly with a client's reasonable requests for information. (Counts 3 and 4)

1.4(b): Failure to explain a matter to the extent reasonably necessary to permit a client to make informed decisions. (Counts 3 and 4)

1.5(b): Failing to communicate the scope of the lawyer's representation and the basis or rate of the fee for which a client will be responsible. (Count 3)

1.16(d): After the termination of representation, failure to protect a client's interests, failure to refund an unearned fee, and failure promptly to return to a client case file materials to which the client is entitled. (Count 4)

3.3(a)(1): Knowingly making a false statement of fact or law to a tribunal. (Count 2)

3.5(b): Engaging in an improper ex parte communication with a judge. (Count 2)

4.2: Improperly communicating with a person the lawyer knows to be represented by another lawyer in the matter. (Count 2)

8.1(a): Knowingly making a false statement of material fact to the Disciplinary Commission in connection with a disciplinary matter. (Count 4)

13

8.4(b): Committing a criminal act (disorderly conduct) that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer. (Count 1)

8.4(d): Engaging in conduct prejudicial to the administration of justice. (Count 1)

The hearing officer recommended either suspension without automatic reinstatement or disbarment. The Court notes Respondent's history of misconduct, his unsuccessful prior attempt at rehabilitation, his inability to appreciate the wrongfulness of his current misconduct (except admitting "losing it" in Count 1), and his confrontational attitude toward those involved in the disciplinary process. Of particular concern is Respondent's continued inability to manage his anger, his attempts to blame others, including his own clients, for his misconduct, and his dishonesty toward a court and the Commission. Under these circumstances, the Court concludes that disbarment is warranted in this case.

## Conclusion

The Court concludes that Respondent violated the Indiana Rules of Professional Conduct by multiple acts of misconduct, including dishonesty to a court and to the Commission, improper ex parte communication with a judge, improper communication with a represented party, pervasive neglect of vulnerable clients, disorderly conduct in a judicial facility, and conduct prejudicial to the administration of justice.

For Respondent's professional misconduct, the Court disbars Respondent from the practice of law in this state effective June 27, 2014. Respondent shall not undertake any new legal matters between service of this order and the effective date of the disbarment, and Respondent shall fulfill all the duties of a disbarred attorney under Admission and Discipline Rule 23(26).

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d). The Clerk is further directed to post this opinion to the Court's website, and Thomson Reuters is directed to publish a copy of this opinion in the bound volumes of this Court's decisions.

Dickson, C.J., and Rucker, David, and Rush JJ., concur. Massa, J., concurs in part, dissents in part regarding the discipline, and would impose a three-year suspension without automatic reinstatement.